# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:

SIGNIA, LTD.,

               Debtor.

)   Case No. 23-14384-TBM
)   Chapter 11
)
)   <u>Hearing Information</u>
)   Date:  November 9, 2023
)   Time:  10:30 a.m.

---

## MALE EXCEL'S OBJECTION TO MOTION FOR FINAL ORDER APPROVING FINANCING PURSUANT TO 11 U.S.C. § 364

---

151072141

## TABLE OF CONTENTS

I.    Introduction ................................................................................................ 1

II.   Factual Background ..................................................................................... 3

      A.    General Background .......................................................................... 3

      B.    The Debtor Is Owned and Controlled by Two Entities—One of Which is the
            Proposed Lender—That Similarly Own and Control the Vast Majority of the
            Debtor's Undisputed Unsecured Creditors. ........................................... 4

      C.    The Debtor Admits It Has Not Turned a Profit Since 2020 and Projects No
            Profits in the Coming Months, Yet Its Parent Entities and Affiliates Continue
            to Layer Increasingly More Debt on the Debtor's Operations. ............... 6

      D.    The Debtor's Principal Admits That the Loan Agreement Neither Marketed,
            Nor Negotiated, and That He Acted in Sulit's Best Interest When Approving
            the Loan Terms. ............................................................................... 8

III.  Legal Argument ........................................................................................ 10

      A.    The Debtor Admittedly Cannot Demonstrate That Postpetition Financing
            from Its Parent Is Necessary, Fair, Reasonable, or the Best Option Available. ... 10

            1.    The Debtor Does Not Demonstrate That It Was Unable to Obtain
                  Postpetition Financing on an Unsecured Basis. ......................... 10

            2.    The Debtor Has Not Demonstrated That the Loan Is Necessary to
                  Preserve the Assets of the Debtor's Estate. .............................. 12

            3.    The Terms of the Sulit Loan Are Not Fair, Reasonable, or Adequate,
                  Particularly Considering the Relationship Between the Debtor and
                  Sulit. ........................................................................................ 13

      B.    The Debtor's Principal Admits That He Did Not Exercise the *Debtor's*
            Business Judgment in Seeking Approval of the Loan. ......................... 13

      C.    The Debtor's Conduct in Negotiations with Sulit—and Sulit's Insider
            Status—Preclude a Good Faith Finding under § 364(e) in the Event the Court
            Grants the Motion. ............................................................................. 15

      D.    An Evidentiary Hearing, with Limited Discovery, Is Necessary in the Event
            the Court Is Inclined to Grant the Motion. ........................................... 16

IV.   Conclusion ................................................................................................ 16

151072141

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Ames Dept. Stores, Inc.*,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ........................................................10, 11, 14

*In re Aqua Assocs.*,
  123 B.R. 192 (Bankr. E.D. Pa. 1991) ...................................................................10

*Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*,
  789 F.2d 1085 (4th Cir. 1986) .............................................................................10

*In re Crouse Group. Inc.*,
  71 B.R. 544 (Bankr. E.D. Pa. 1987) ...............................................................10, 11

*In re LATAM Airlines Grp. S.A.*,
  2020 WL 5506407 (Bankr. S.D.N.Y. Sept. 10, 2020) .....................................13, 14

*In re Los Angeles Dodgers LLC*,
  457 B.R. 308 (Bankr. D. Del. 2011) .....................................................................11

*In re Reading Tube Indus.*,
  72 B.R. 329 (Bankr. E.D. Pa. 1987) .....................................................................10

*In re Republic Airways*,
  2016 WL 2616717 (Bankr. S.D.N.Y. May 4, 2016).............................................14

*In re St. Mary Hospital*,
  86 B.R. 393 (Bankr. E.D. Pa. 1988) .....................................................................10

*Weinstein v. Gill (In re Cooper Commons, LLC)*,
  430 F.3d 1215 (9th Cir. 2005) ..............................................................................15

**Statutes**

11 U.S.C. § 364...............................................................................................1, 3, 9, 11

11 U.S.C. § 364(c) .......................................................................................2, 10, 12, 13

11 U.S.C. § 364(e) .........................................................................................2, 15, 16

151072141

Male Excel Medical P.A. and Male Excel Inc. (collectively, "Male Excel") hereby submit this objection (the "Objection") to the *Motion for Interim and Final Orders Approving Financing Pursuant to 11 U.S.C. § 364* [Docket No. 22] (the "Motion") filed by Signia, Ltd. (the "Debtor") in the above-captioned case (the "Bankruptcy Case") pending under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[1]  In support of the Objection, Male Excel refers to the transcript of the meeting of creditors in this Bankruptcy Case under § 341(a) filed concurrently herewith (the "341(a) Transcript"), the filings and other matters of record in this Bankruptcy Case, and respectfully states as follows:

## I.

## INTRODUCTION[2]

The Debtor admits it abdicated its fiduciary obligations and business judgment when "negotiating" the loan with its parent entity, Sulit.  The Debtor has operated a loss for four of the last five years.  In the past, the Debtor covered operating losses with nearly free access to unsecured debt from Sulit and two other affiliate-insiders controlled by Sulit.  None of these revolving lines were matured as of the Petition Date.  The Debtor's projections show more of the same—continued operating losses over the next six months—but Sulit's tune has changed.

The Debtor seeks authority to obtain additional credit from Sulit.  But, this time, Sulit is only willing to extend credit on a superpriority, secured basis under § 364.  Despite no exigency requiring an immediate filing (other than state court litigation deadlines), the Debtor admits it did not attempt to seek financing from non-insider sources.  Additionally, the Debtor did not request

---

[1] Unless otherwise set forth herein, all references to "Section" or "§" refer to a section of the Bankruptcy Code.

[2] Unless otherwise defined herein, all capitalized terms used in this Introduction have the definitions set forth elsewhere in this Objection.

151072141

an equity infusion from Sulit or continued extension of unsecured debt. Sulit did not engage separate counsel or materially negotiate the Loan Agreement. Instead, the Debtor's CEO—also the CEO and 50% equity owner of Sulit—decided to "offer" Sulit superpriority, secured credit right off the bat. When asked why he did not request a better deal for the Debtor, the Debtor's principal explained, "I guess it just **wasn't in -- in Sulit's best interest** to offer an unsecured loan to that company. I guess that's the only answer I have." 341(a) Tr. at 47:11-48:6 (emphasis added).

The failure to seek unsecured financing is fatal on its own—as expressly contrary to § 364(c)—but made worse by other onerous provisions of the Loan Agreement. Sulit is not required to seek leave of Court to declare its debt in default. Instead, Sulit can declare a default if, among a litany of other things, it determines "in its sole discretion" that an nonmonetary order is entered that may cause a material adverse effect. *See, e.g.*, Loan Agmt., § 20 at 6. The provisions of the Loan Agreement will permit Sulit to effectively control the Bankruptcy Case for its own purposes rather than those of the Debtor and its estate. To the extent it is not already the case, the Loan Agreement will install Sulit as an unchecked shadow "fiduciary."

In the event the Court is inclined to grant the Motion, the relationship and "negotiations" between the Debtor and Sulit clearly preclude a good faith finding under § 364(e). Additionally, the facts merit an evidentiary hearing with limited additional discovery concerning the Debtor, Sulit, and its insiders.

Male Excel is concerned that the Motion is little more than an effort to elevate Sulit's status over unsecured creditors. Sulit and its affiliates had a longstanding practice of propping the Debtor up with unsecured debt. The proposed superpriority, secured revolving loan would change this practice to elevate Sulit above unsecured creditors. This is particularly troubling where—aside

2

151072141

from the disputed Male Excel claim—insider claims comprise approximately 93% of all unsecured claims in this Bankruptcy Case.  With little apparent hope for a successful future, the loan seems little more than Sulit's last effort to squeeze what is left out of the Debtor rather than share with unsecured creditors.  In light of the foregoing, and as more fully set forth below, Male Excel respectfully requests that the Court deny the Motion.

**II.**

**FACTUAL BACKGROUND**

**A.**     **General Background**

1.     On September 27, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code.  *See* Docket No. 1.  As of the date of this Objection, the Debtor is operating its business and managing its assets as a debtor-in-possession, pursuant to §§ 1182(2) and 1184.

2.     On September 29, 2023, the Debtor filed the Motion requesting, *inter alia*, entry of orders authorizing the Debtor to obtain postpetition financing from Sulit Group, Ltd. ("Sulit"), pursuant to the terms of that certain *Secured DIP Lending Agreement* (the "Loan Agreement").  *See* Mot. at 6, Ex. 1.  The Motion is supported by the *Declaration of Jeffrey Fell in Support of First Day Motions* [Docket No. 24] (the "Fell Declaration").

3.     On October 4, 2023, the Court entered the *Agreed Interim Order Approving Financing Pursuant to 11 U.S.C. § 364 on an Interim Basis* [Docket No. 37] (the "Interim Financing Order") that granted the Motion on an interim basis and set a final hearing on the Motion for November 9, 2023.

3

151072141

4.      Male Excel is the holder of a judgment in excess of $2 million, subject to additional attorneys' fees, costs, and sanctions to be assessed by the court, entered by the District Court for the Clark County, Nevada.

**B.      The Debtor Is Owned and Controlled by Two Entities—One of Which is the Proposed Lender—That Similarly Own and Control the Vast Majority of the Debtor's Undisputed Unsecured Creditors.**

5.      The Debtor is a portfolio company that provides call center services across a spectrum of industries.  *See, e.g.*, Fell Decl., ¶ 5 at 1.  It is owned by two investment entities— Sulit and Vero Investment Company ("Vero")—that are ultimately controlled by Jeffrey Fell and Alfred Trexler.

6.      The Debtor and its representatives admit the following corporate ownership structure:



*See* 341(a) Tr. at 8:11-13; *id.* at 8:24-9:2; 13:4-9.

4

7.     Several other insider affiliates of the Debtor are listed as unsecured creditors in the Debtor's schedules, and are under common ownership of Mr. Fell and Mr. Trexler, through Sulit and Vero.[3]  The largest of these insider claims are as follows:

- **National Research & Polling Group, Ltd.**  National Research & Polling Group, Ltd. ("NRPG") is jointly owned by Sulit and Vero.  *See id.* at 26:12-20.  NRPG provides client relationship management services and outsources call center work to the Debtor.  *See id.*  NRPG is scheduled as holding a $543,168.10 unsecured claim based on a "revolving note" allegedly based on loans to the Debtor for operating expenses and prepayments for call center services.  *See id.* at 34:2-8; Docket No. 66 (Sched. E/F, ¶ 3.16 at 4).

- **JAFT Ventures LLC.**  JAFT Ventures LLC ("JAFT") is jointly owned by Sulit and Vero.  *See* 341(a) Tr. at 30:24-31:1.  JAFT owns the real property at which the Debtor's headquarters are located, in Westminster, Colorado.  *Id.*; *see also* Docket No. 1 (Sched. G, ¶ 2.20 at 5).  JAFT is scheduled as holding a $384,921.47 unsecured claim based on a "revolving note;" however, the Debtor's principal testified the amount allegedly relates to unpaid rent for the Westminster location. *See id.* at 33:8-22; Docket No. 66 (Sched. E/F, ¶ 3.14 at 4).  Mr. Fell could not recall the last time the Debtor paid rent to JAFT.  *See id.*

8.     Additionally, Sulit is scheduled as holding a $2,127,905.15 unsecured claim based on a "revolving note."  *See* Docket No. 66 (Sched. E/F, ¶ 3.22 at 5).  Between 2020 and 2022, the Debtor allegedly borrowed "roughly" $2 million from Sulit to fund the Debtor's acquisition of Public Interest Communications, Inc. ("PIC").  *See* 341(a) Tr., at 42:25-43:9.  Although the Debtor's principal did not offer an assessment of the success of the PIC transaction, the Debtor's principal uncollectable accounts receivable balance—in the amount of $576,348—relates to clients acquired in the PIC transaction.  *See id.* at 31:23-32:10; *see also* Docket No. 1 (Sched. A/B, ¶ 11b at 2).

---

[3] The Debtor's *Chapter 11 Small Business Balance Sheet* [Docket No. 8] also identifies intercompany payables outstanding to: DialCloud LLC in the amount of $5,400; and Sunlight Support, in the amount of $158.73.  *See* Docket No. 8 at 1.  It also appears to reflect a payable between the Debtor and PIC (defined below) in the amount of $462,870.72; however, it is unclear if this is a journal entry or liability as between the entities.  *Id.*

5

9.     Aside from the debt owed to Male Excel, the Debtor's unsecured claims pool[4] is principally comprised of debts owed to affiliate-insiders.  When adjusting for the single, disputed claim owed to Male Excel, the total asserted amount of priority and nonpriority general unsecured claims totals $3,269,338.  ***More than 93 percent of undisputed, unsecured claims relate to debts of insider entities controlled by Mr. Fell and Mr. Trexler***:[5]

| | | % of Undisputed Unsecured Claims |
|---|---|---|
| Total Unsecured Claims | $5,321,083.00 | |
| *Less* Scheduled Male Excel Claim | ($2,051,745.00) | |
| **Total Undisputed Unsecured Claims** | **$3,269,338.00** | |
| Sulit Claim | $2,127,905.15 | 65.09% |
| NRPG Claim | $543,168.10 | 16.61% |
| JAFT Claim | $384,921.47 | 11.77% |
| DialCloud LLC Claim | $5,400.00 | 0.17% |
| **Total Insider Unsecured Claims** | **$3,061,394.72** | **93.64%** |

Aside from the debt owed to Male Excel, non-insider unsecured claims total just $207,943.28, or 6.36% of all undisputed, unsecured claims.

**C.     The Debtor Admits It Has Not Turned a Profit Since 2020 and Projects No Profits in the Coming Months, Yet Its Parent Entities and Affiliates Continue to Layer Increasingly More Debt on the Debtor's Operations.**

10.     The Debtor readily admits that it "has operated at a loss every year since 2018, other than in 2020."  Fell Decl., ¶ 6 at 1.  The unusual performance in 2020 allegedly owed to the success of the Debtor's political campaign services during the election year.[6]  *See* 341(a) Tr., at

---

[4] The Debtor's single secured creditor is allegedly oversecured.  *See* Docket No. 66 (Sched. G, ¶ 2.1 at 1).

[5] The following chart was compiled with data from the Debtor's Schedule E/F [Docket No. 66].

[6] The Debtor does not address the impact Paycheck Protection Program loans—$1,588,542 of which were ultimately forgiven in 2021 and 2022—had on the Debtor's outlier performance in 2020.  *See* Docket No. 66 (SOFA, ¶ 2 at 1).

6

27:25-28:2. Despite the banner year, at the "end of 2020," the Debtor initiated the two-year buyout of PIC and incurred "significant debt" to fund that purchase from Sulit. *See* Fell Decl., ¶ 6 at 1; *see also* 341(a) Tr., at 32:25-33:1.

11. With the 2024 election cycle fast approaching, the Debtor initially offered a rosy outlook for its performance. Drawing parallels to 2020, Mr. Fell predicted that "I would anticipate that 2024 will have a similar [] revenue number to 2020." 341(a) Tr., at 28:10-11.

12. However, the Debtor's six-month budget predicts more of the same. Although revenue associated with the Debtor's political work is expected to increase, the Debtor projects it will continue operating at a loss through April 2024. *See* Docket No. 52, Ex. 2. In the period between the Petition Date and April 30, 2023, the Debtor anticipates that it will operate at a net loss of $234,503. *See id.*

13. On the Petition Date, the Debtor held just $6,226 in cash with $70,217 in accounts receivable aged less than 90 days. *See* Docket No. 1 (Sched. A/B, ¶ 5 at 1, ¶ 11a at 2). To fund operating losses,[7] the Debtor requests approval to enter into a $1 million secured credit facility with its parent entity, Sulit. *See* Mot. at 2. The Debtor seeks authorization to grant Sulit, among other things, a superpriority administrative claim and a valid, perfected, enforceable, and non-avoidable first priority lien in all postpetition accounts receivable to secure repayment. *See id.* at 4. The Loan Agreement also includes onerous default provisions that permit Sulit to call the loan in default at virtually any time. *See* Mot. at 3-4.

---

[7] The Motion claims the loan is for "operating and administrative expenses during the bankruptcy case," Mot. at 2, however, Mr. Fell confirmed that loan proceeds would only be applied to operating expenses. *See* 341(a) Tr., at 44:2-45:2.

151072141

D.   **The Debtor's Principal Admits That the Loan Agreement Neither Marketed, Nor Negotiated, and That He Acted in Sulit's Best Interest When Approving the Loan Terms.**

14.     Sulit is the Debtor's parent entity and is controlled by the Debtor's own officers. Sulit previously financed the Debtor's acquisition of PIC on an unsecured basis.  Moreover, Sulit's subsidiaries similarly offered the Debtor unsecured loans for payment of rent, operating costs, and unspecified prepaid services.  With that history in mind, the terms of the Loan Agreement are a sharp about-face.

15.     The Loan Agreement does not provide for financing on an unsecured basis.  Instead, Sulit demands a superpriority administrative claim and a first-priority lien on all post-petition accounts receivable and cash, subject to the prepetition lien of the Small Business Administration. *See* Loan Agmt., § 11 at 3, § 15 at 4; *see also* Interim Order at 3.  The loan becomes immediately due and payable upon the occurrence of a litany of defaults, including, but not limited to: (i) the Debtor ceasing to be a debtor-in-possession; (ii) the entry of *any* nonmonetary judgment or order, with respect to a prepetition or postpetition action, that Sulit determines to cause "a material adverse effect" in Sulit's sole discretion; or (iii) Sulit "deems itself insecure" as a result of a material adverse change in the Debtor's financial condition. *See id.*, § 20 at 6.  Sulit can terminate the loan immediately—without recourse to the Court to determine whether a default has occurred—upon its determination that the Debtor defaulted.  *See id.*

16.     Mr. Fell's straightforward testimony at the § 341(a) meeting makes clear that he included these provisions for the benefit of Sulit—not the Debtor.  Mr. Fell did not negotiate with anyone at Sulit for the loan and Sulit did not retain separate counsel. *See* 341(a) Tr. at 47:4-48:22. Debtor's counsel provided a form loan agreement "to Sulit and they revised it for this case," and,

8

151072141

save for "maybe one redline," no further drafts or versions of drafts were exchanged between the parties. *Id.*   When questioned why Sulit did not obtain a loan on similar terms to prepetition lending, Mr. Fell explained:

> MR. KOFFROTH: Did you ask to [Sulit's] representative [] to consider providing an equity infusion instead of a loan?
>
> MR FELL: No.
>
> MR KOFFROTH: Did you ask Sulit's representative, or did Sulit consider providing financing on an unsecured basis?
>
> MR. FELL: No.
>
> MR. KOFFROTH: Any reason that Sulit didn't consider that, or you didn't request that?
>
>                     * * *
>
> MR. FELL: I guess it just wasn't in -- in Sulit's best interest to offer an unsecured loan to that company.  I guess that's the only answer I have.
>
> MR. KOFFROTH: Understood. Who made that determination that it wasn't in Sulit's best interest?
>
> MR. FELL: Myself and my business partner.

*Id.* at 47:11-48:6 (cleaned up).

17.   The Debtor's principal was admittedly looking out for the interests of Sulit—not the estate—when the terms of the Loan Agreement were negotiated.  As set forth below, Male Excel submits that the Debtor is incapable of satisfying § 364 on these facts and that the loan does little more than further what appears to be a history of Sulit operating the Debtor for its sole benefit.

9

151072141

III.

**LEGAL ARGUMENT**

A.    **The Debtor Admittedly Cannot Demonstrate That Postpetition Financing from Its Parent Is Necessary, Fair, Reasonable, or the Best Option Available.**

The Debtor may obtain credit under § 364(c) only if the Debtor "is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense." 11 U.S.C. § 364(c). To satisfy § 364(c) the Debtor must establish, with evidence, that: (i) it cannot obtain unsecured credit without superpriority status; (ii) the loan is necessary to preserve the assets of the Debtor's estate, and (iii) the terms of the Loan are fair, reasonable and adequate given the circumstances of the Debtor and Sulit. *See In re Crouse Group. Inc.*, 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hospital*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988). The Debtor fails to satisfy each requirement to obtain credit under § 364(c).

1.    **The Debtor Does Not Demonstrate That It Was Unable to Obtain Postpetition Financing on an Unsecured Basis.**

The Debtor did not satisfy its obligation to engage in good faith efforts to obtain postpetition financing. *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). The Debtor admits that it did not contact any potential lenders, other than Sulit, in advance of the Petition Date. *See* 341(a) Tr. at 46:3-47:3. The Debtor was not required to "contact a seemingly infinite number of possible lenders" and the Court may certainly consider the futility of such efforts given the Debtor's financial circumstances. *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987); *see also Ames Dep't Stores. Inc.*,

10

151072141

115 B.R. at 40.  But, on its face, the Debtor's admission that it made ***no*** effort at all hardly qualifies as a good faith effort given that the petition was not precipitated by an imminent potential harm to operations.  Moreover, the Debtor's efforts to contact potential lenders is only one half of the analysis.

The Debtor must also demonstrate that it had exhausted all sources unsecured credit.  *See Ames Dept. Stores, Inc.*, 115 B.R. at 20 (the court "may not approve any credit transaction under subsection (c) [of Section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"); *Crouse Group, Inc.*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (financing denied because the debtors in possession did not demonstrate that they had exhausted all sources of unsecured credit); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 312–14 (Bankr. D. Del. 2011) (holding that debtor failed to show it could not obtain unsecured credit where debtor, because of hostile relationship between debtor's principal and proposed lender, refused to negotiate with the proposed lender offering an unsecured loan).

Here, the Debtor does not make any allegation that it exhausted sources of unsecured financing.  The Debtor admits it had revolving unsecured lines of credit with its insiders—Sulit, NRPG, and JAFT—exceeding $3 million on the Petition Date.  None of these unsecured, revolving lines of credit were matured on the Petition Date.  *See, e.g.*, 341(a) Tr. at 36:6-10, 34:15-17.  Indeed, the Debtor's representative suggested the Debtor was still eligible to borrow on the unmatured NRPG revolving line as of the Petition Date.  *See id.* at 34:23-35:1 ("That note from NRPG to Signia is a revolving note for, you know, operating capital.  There's a point at which it matures, and it can no longer be borrowed on and following that, you know, there's a payment schedule.").  The Debtor's failure to request unsecured debt from its affiliate insiders with open,

11

unsecured revolving lines of credit is an inexplicable failure to exhaust all sources of unsecured credit.

Additionally, in its negotiations with Sulit, the Debtor admits it did not request an equity infusion or additional unsecured debt *because the Debtor's principal thought it would not be in Sulit's best interest*.  The Debtor's principal admits that:

> MR KOFFROTH: Did you ask Sulit's representative, or did Sulit consider providing financing on an unsecured basis?
>
> MR. FELL: No.  . . . I guess it just wasn't in -- in Sulit's best interest to offer an unsecured loan to that company.  I guess that's the only answer I have.

*Id.* at 47:11-48:6 (cleaned up).  Aside from an astonishing lapse of fiduciary responsibility, the Debtor's decision to only seek superpriority administrative expense and secured status in the proposed loan served (intentionally) only to benefit Sulit.  It similarly falls far short of the Debtor's responsibility to demonstrate "good faith" efforts to exhaust all sources of unsecured financing.  Accordingly, the Debtor cannot satisfy § 364(c).

## 2. The Debtor Has Not Demonstrated That the Loan Is Necessary to Preserve the Assets of the Debtor's Estate.

The Debtor cannot demonstrate that the loan is necessary to preserve the Debtor's business for two reasons.  *First*, as set forth above, the Debtor admits it has access to unsecured revolving loans from its affiliate insiders—including NRPG—that are unmatured as of the Petition Date.  The Debtor admits it has operated at a loss from 2018 to the Petition Date (but for one year) and did not file the Bankruptcy Case because of the loss of a funding source.  *Second*, the Debtor's budget offers little more than continued operating losses for at least the next six months.  Although the loan will fund projected operating losses, the Debtor is proposing to permit an insider to stack additional superpriority, secured debt on top of a business that is apparently incapable of turning

12

a profit.  The move looks more like an effort to elevate the claim of an insider over other unsecured creditors than a genuine effort to save a temporarily faltering business.  Accordingly, under these facts, the Debtor has not demonstrated the Sulit loan is necessary to preserve the Debtor's assets and may be more likely to further dissipate recovery.

   **3.     The Terms of the Sulit Loan Are Not Fair, Reasonable, or Adequate, Particularly Considering the Relationship Between the Debtor and Sulit.**

   The Sulit loan provisions collectively permit Sulit to subsume control of the Debtor and elevate its substantial prepetition unsecured claims.  Sulit and its subsidiaries hold more than 93% of the Debtor's undisputed unsecured claims—principally based on revolving loans to fund operating losses among other things.  Rather than continue the practice of offering unsecured loans prepetition, Sulit now seeks to elevate its further advances to the Debtor over all other unsecured creditors.  Moreover, the default provisions in the loan would permit Sulit to pull the plug on the Bankruptcy Case at any time it chooses; including, entry of any order that Sulit believes *in its sole discretion* would cause "a material adverse effect."  Loan Agmt., § 20 at 6.  With this, Sulit will render *de jure* the already *de facto* substitution of its judgment for that of the Debtor's.  The arrangement is entirely for the benefit of Sulit and is neither fair, reasonable, or adequate to protect the interests of the Debtor's estate.  Accordingly, the Court should deny the Debtor's request to approve the loan under § 364(c).

**B.     The Debtor's Principal Admits That He Did Not Exercise the *Debtor's* Business Judgment in Seeking Approval of the Loan.**

   The Debtor fails to demonstrate that it exercised ***its*** business judgment in deciding to approve the loan.  When a proposed transaction with a debtor involves "insiders," courts apply "heightened" or "rigorous" scrutiny in assessing the bona fides of the transaction.  *In re LATAM*

13

*Airlines Grp. S.A.*, 2020 WL 5506407, at \*27 (Bankr. S.D.N.Y. Sept. 10, 2020) (citing *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997), *aff'd*, 160 F.3d 982 (3rd Cir. 1998); *In re MSR Hotels & Resorts, Inc.*, 2013 WL 5716897, at \*1 (Bankr. S.D.N.Y. Oct. 1, 2013)).  If a transaction involves an insider, the insider bears the burden of showing the "entire" or "inherent" fairness of the transaction at issue.  *Id.* at \*27 (citing *WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998); *L.A. Dodgers LLC*, 457 B.R. at 313; *Papercraft*, 211 B.R. at 823).  The evidence falls far short of this heightened standard.  Mr. Fell admits that the decision to request superpriority, secured financing was premised on the best interests of Sulit and ***not*** the Debtor.  *See* 341(a) Tr. at 47:11-48:6 ("I guess it just wasn't in -- in Sulit's best interest to offer an unsecured loan to that company.  I guess that's the only answer I have.").  The Debtor has otherwise presented no evidence of the "entire" or "inherent" fairness of the transaction, particularly given the prepetition funding practice of Sulit, NRPG, and JAFT.

Indeed, the Debtor fails to meet the traditional business judgment standard applicable to non-insider transaction.  Normally, the Debtor's business judgment that is entitled to deference when considering approval of postpetition financing.  *In re Republic Airways*, 2016 WL 2616717, at \*11 (Bankr. S.D.N.Y. May 4, 2016) ("In determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment.").  A court will defer to a debtor's business judgment "so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest." *Ames Dep't Stores*, 115 B.R. at 40.  ***First***, Mr. Fell's admission that he considered the best interests of Sulit, not the Debtor, evidences that he was not acting in his fiduciary role as principal of the Debtor when negotiating the loan.  *See* 341(a) Tr. at

14

47:11-48:6.  *Second*, as set forth above, the loan does little to benefit the estate and instead alters the prepetition course of conduct between Sulit and the Debtor to permit continued lending on terms much more advantageous to Sulit.  Accordingly, the Debtor admittedly cannot demonstrate that it exercised its business judgment in approving the loan.

C.      **The Debtor's Conduct in Negotiations with Sulit—and Sulit's Insider Status— Preclude a Good Faith Finding under § 364(e) in the Event the Court Grants the Motion.**

The Debtor cannot demonstrate an entitlement to good faith findings under § 364(e). Section 364(e) grants certain protections "to an entity that extended such credit in good faith" that negotiated at arms' length with the Debtor.  11 U.S.C. § 364(e); *see also Weinstein v. Gill (In re Cooper Commons, LLC)*, 430 F.3d 1215, 1220 (9th Cir. 2005) (affirming good faith finding where debtor submitted declarations "describing the need for additional financing to complete the project, the efforts made to analyze the amount necessary to complete the work, and the parties' subjective beliefs that the agreement was negotiated at arms' length and would be in the best interest of the estate and its creditors").  Again, the Debtor's own admissions speak volumes: the Debtor's principal admits the loan was not materially negotiated.  *See* 341(a) Tr. at 47:4-48:22.  Nor did the Debtor's principal seek financing on more favorable terms.  *See id.* at 47:11-48:6.  Indeed, rather than an arm's length negotiation, the Debtor's principal was effectively negotiating against himself as the CEO and ultimate equity holder of both the Debtor and Sulit.  In the course of this process, the Debtor's CEO elevated his duties to Sulit over those he owes to the Debtor and the estate and avoided any deal that was not "in Sulit's best interest."  *Id.*  Moreover, Sulit has not submitted any evidence of its good faith efforts and, even if it did, such a declaration could hardly contradict the

15

sworn testimony at the Debtor's 341(a) meeting.  Accordingly, the Sulit is not entitled to a good faith finding in any order approving the Motion.

**D.**     **An Evidentiary Hearing, with Limited Discovery, Is Necessary in the Event the Court Is Inclined to Grant the Motion.**

The testimony of the Debtor's principal, and the Debtor's sworn schedules and statements filed in this Bankruptcy Case, provide ample evidence that the Debtor cannot meet its burdens under §§ 364(c) and (e).  As such Male Excel has not sought additional discovery from the Debtor, Sulit, or their other affiliates and insiders in the interest of judicial efficiency and the preservation of estate resources.  However, to the extent the Court is inclined to grant the Motion, Male Excel requests the right to conduct limited discovery into the loan from the Debtor, Sulit, and their insiders, and present evidence to the Court at a further evidentiary hearing on the Motion.

**IV.**

**CONCLUSION**

For the reasons set forth herein, Male Excel respectfully requests that the Court enter an order: (i)(a) denying the Motion, or, in the alternative, (b) denying relief under § 364(e) and setting the Motion for evidentiary hearing; and (ii) granting Male Excel such other and further relief as is just and appropriate under the circumstances.

16

151072141

Dated: November 2, 2023                    FOX ROTHSCHILD LLP

*/s/ Christopher T. Groen*
Christopher T. Groen, Atty. No. 39976
cgroen@foxrothschild.com
1225 17th Street, Suite 2200
Denver, CO 80202
Tel:    303.292.1200
Fax:    303.292.1300

- and-

**HONE LAW**
Eric D. Hone (NV Bar No. 8499)
ehone@hone.law
Leslie A. S. Godfrey (NV Bar No. 10229)
lgodfrey@hone.law
701 N. Green Valley Parkway, Suite 200
Henderson, NV 89074

*Counsel to Male Excel Medical P.A. and
Male Excel Inc.*

151072141

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 2nd day of November, 2023, I served a true and correct copy of the foregoing **MALE EXCEL'S OBJECTION TO MOTION FOR FINAL ORDER APPROVING FINANCING PURSUANT TO 11 U.S.C. § 364** via CM/ECF and first-class United States mail, postage prepaid, on the following:

Mark David Dennis
SL Biggs, A Division of SingerLewak LLP
2000 S. Colorado Boulevard
Tower 2, Suite 200
Denver, CO 80222

Signia, Ltd.
6521 West 91st Avenue
Westminster, CO 80031

David V. Wadsworth
Wadsworth Garber Conrardy, P.C.
2580 West Main Street, Suite 200
Littleton, CO 80120

Benjamin Sales
DOJ-UST
1961 Stout Street, Suite 12-200
Denver, CO 80294

U.S. Trustee
1961 Stout Street, Suite 12-200
Denver, CO 80294

*/s/ Rhonda A. Hanshe*
for Fox Rothschild LLP

18

151072141